# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### LOUISVILLE DIVISION

CIVIL ACTION NO. 3:08CV-00648-JHM

SCOTT THORNTON                                                                    PLAINTIFF

VS.

WESTERN & SOUTHERN FINANCIAL GROUP
BENEFLEX PLAN, et. al.                                                          DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a motion by Defendants for summary judgment on all the

claims [DN 36]; on a motion by Plaintiff, Scott Thornton, for summary judgment regarding LTIR

Plan Benefits [DN 37]; and on a motion by Defendants to strike the Plaintiff's "Reply

Memorandum" addressing his ERISA claim [DN 49]. Fully briefed, this matter is ripe for decision.

## I. BACKGROUND

Plaintiff, Scott Thornton ("Thornton"), was hired as a field representative selling life

insurance for Defendant, Western and Southern Life Insurance Company ("Western & Southern"),

on July 11, 2005. While employed at Western & Southern, Thornton participated in a long-term

disability insurance plan, The Western and Southern Life Insurance Company Flexible Benefits

Plan. The long-term disability insurance plan is a self-insured plan, the administration of which is

vested in the Benefits Committee of Western & Southern. Benefits are payable under the Plan if the

employee qualifies as "long term disabled" as defined under the Plan and meets the length of service

requirement. Section 2.34 of the Plan defines "Long Term Disability or Long Term Disabled" in

relevant part as "[w]ith respect to a Covered Employee who is a Field Representative or District

Office Clerical Employee, Long Term Disability or Long Term Disabled shall mean the complete

and continuous incapacity of such Covered Employee, to engage in any and every occupation,

business or employment, including self employment, for wages, compensation or profit." (Id. at §
2.34(a).) The Plan further provides that "[a] Field Representative . . . shall not be eligible for Long
Term Disability Benefits until the January 1 of the Plan Year following the completion of his second
Year of Employment." (Id. at § 7.2(b).) The Plan also contains a pre-existing condition limitation
that provides in part as follows: "No benefits shall be paid for any period of Long Term Disability
. . . which results from a Pre-existing Condition." (Id. at § 7.6.)

Thornton also participated in the Long Term Retention Incentive Plan ("LTIR") which was
designed to provide an incentive for field representatives to maximize performance and to remain
within Western & Southern. On May 1, 2007, Thornton was awarded four units under the LTIR
Plan valued at $24,492.00. The LTIR Plan benefits were scheduled to vest in seven years on May
1, 2014. However, the LTIR Plan provided that "[i]n the event that a Participant dies or becomes
long term disabled as defined in the Company's Flexible Benefits Plan while employed by the
Company or an Affiliate, all of the Performance Units in such Participant's Account shall become
100% vested." (LTIR Plan at § 3.3(d)).

In 1970, Plaintiff suffered a broken neck when a grain elevator fell on him. At that time,
Thornton underwent neck surgery and was then asymptomatic for neck pain until 2002. In 2002,
Thornton was treated for the neck pain by Dr. John R. Dimar, an orthopedic surgeon. In December
of 2002, Thornton underwent a vertebrectomy at the C6. A subsequent surgery was conducted to
reinforce the fourth cervical vertebrae to the first thoracic vertebrae. At that time, ten screws and
two rods were placed in his neck. Thornton testified that the second surgery relieved the pain.

Plaintiff was hired by Western & Southern in July of 2005. Plaintiff began experiencing
neck pain in late 2006, and in February of 2007, it was discovered that one of the screws placed in

his neck had broken. On June 18, 2007, Dr. Dimar, along with Dr. John Harpring and Dr. Christopher Shields, operated on Thornton at which time the medical team attempted to repair, or fuse, the nonunion at the C7-T1 level. The screws were removed and replaced with larger screws. Plaintiff returned to work on July 9, 2007, but continued to experience severe pain following the surgery. Plaintiff continued to work until August 24, 2007. At that time, Dr. Dimar informed Thornton that he would need to undergo additional surgery to place an anterior plate in his neck. Thornton went on Family Medical Leave in August of 2007. Thornton applied for and received short-term disability benefits in September of 2007. Thornton underwent surgery in October of 2007. Thornton testified that the surgery failed and he has been in constant neck pain since that time. Thornton exhausted his FMLA leave on October 30, 2007. On January 28, 2008, Western & Southern terminated Thornton due to his inability to return to work.

On November 26, 2007, Thornton applied for long-term disability under the Plan. (WS 619.) By letter dated February 1, 2008, Benefits Director Dean Vonderheide ("Vonderheide") denied Thornton's long-term disability claim finding that Thornton was "not eligible for these benefits since [he] did not have a disabling condition that began on or after January 1, 2008 that lasted 26 weeks." Specifically, Vonderheide concluded that Thornton's condition began before January 1, 2008. (WS 614; Vonderheide Letter 2/01/08.)

On January 29, 2008, Plaintiff requested that Western & Southern pay his benefits under the LTIR Plan. On February 1, 2008, Western & Southern notified Thornton that he would be required to submit to an examination by a physician of Western & Southern's choosing in order to determine whether Plaintiff was disabled as of January 28, 2008. (WS 614.) Western & Southern obtained an Independent Medical Examination ("IME") of Thornton from Dr. Daniel Primm, an orthopedic

surgeon.  After conducting an exam of Thornton, Dr. Primm concluded that Thornton was not

disabled for any and all work for which he may be qualified.  In his report dated April 17, 2008, Dr.

Primm opined that:

> I think he could perform light work as long as it involved no lifting with the upper extremities over 5 pounds and no lifting or reaching above shoulder level or directly overhead.  I also would recommend that he not have to perform work that would require repetitive or regular turning of the head and neck.  Overall I still feel that his prognosis remains fairly good in terms of his being able to return to his previous work as a life insurance salesman.  I say that particularly if that work could conform to the above recommended work restrictions.  Overall my impression at this time, even though I do not feel he is at MMI, is that he is not completely disabled for any and all work for which he may be qualified.

(Primm IME, April 17, 2008; WS 628.)  Relying on the IME of Dr. Primm, Western & Southern

denied Thornton's claim for vesting of the LTIR units stating that "Mr. Thornton was not unable to

perform the duties of any and every occupation as of January 28, 2008," and as a result, "[h]e has

forfeited all units in the LTIR Plan."  (WS 609; Vonderheide Letter, 5/21/08.)

By letter dated August 6, 2008, Thornton appealed the denial of long-term disability benefits

and the denial of LTIR benefits. (WS 606.)  The Benefits Appeals Committee denied Thornton's

appeal finding in relevant part:

> The Benefits Appeals Committee has reviewed the facts surrounding Mr. Thornton's case, including medical records associated with his condition and the results of an independent medical examination performed by Dr. Daniel D. Primm, Jr.  Section 2.34(a) of the Western & Southern Flexible Benefits Plan defines long-term disability as complete and continuous incapacity of a covered employee to engage in any and every occupation, business or employment, including self-employment, for wages, compensation or profit.  Section 7.6(a) prohibits payment of long-term disability benefits which result from a pre-existing condition.  A pre-existing condition is defined in Section 2.42 as a medical or other health condition for which an individual had treatments, diagnosed symptoms or diagnostic tests performed for the condition within five years before Long Term Disability coverage begins. Section 7.6 states that a Field Representative shall not be eligible for Long Term Disability Benefits until January 1 of the Plan Year following the completion of his second year of employment.  From the information submitted, Mr. Thornton's

condition was in existence prior to his eligibility for Long Term Disability benefits. In addition, it is the Committee's decision that Mr. Thornton is not completely and continuously unable to perform any and all occupations. Therefore, we are unable to honor your request for long-term disability benefits.

LTIR Plan units vest if an associate is determined to be long term disabled according to the Western & Southern Flexible Benefits Plan. Since it is the opinion of Dr. Primm, who performed the independent medical examination, that Mr. Thornton is able to perform light work with restrictions, he is not considered to be long-term disabled as defined by the Plan. Therefore, the LTIR Plan units have not vested, and are not payable to Mr. Thornton.

(WS 598; Hayes Letter, 09/08/08.)

On December 2, 2008, Thornton filed this lawsuit alleging that Western & Southern had wrongfully denied Thornton's long-term disability income benefits under ERISA. Thornton also asserts claims for a violation of the Kentucky Wage and Hour Act, KRS § 337.010, *et seq.*, a breach of fiduciary duty related to his LTIR benefits, and appropriation of Plaintiff's name and likeness.

## II. ERISA CLAIM

### STANDARD OF REVIEW

The Court reviews Western & Southern's decision to deny Thornton long-term disability benefits under "the highly deferential arbitrary and capricious standard of review" because, as both parties acknowledge, Western & Southern has discretionary authority to interpret and apply the Plan. Killian v. Healthsource Provident Adm'rs, Inc., 152 F.3d 514, 520 (6th Cir. 1998) (quotation omitted). The arbitrary and capricious standard "is the least demanding form of judicial review . . . . When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." Perry v. United Food & Commercial Workers Dist. Unions 405 & 442, 64 F.3d 238, 242 (6th Cir. 1995). Put another way, a decision will be upheld "if it is the result of a deliberate, principled reasoning process, and if it is supported by

substantial evidence." Baker v. United Mine Workers of America Health & Retirement Funds, 929 F.2d 1140, 1144 (6th Cir. 1991).

Of course, while the arbitrary and capricious standard is deferential "it is not . . . without some teeth." McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003) (quotation omitted). "[M]erely because [a court's] review must be deferential does not mean [its review] must also be inconsequential. . . . [T]he federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions." Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005). "The obligation under ERISA to review the administrative record in order to determine whether the plan administrator acted arbitrarily and capriciously 'inherently includes some review of the quality and quantity of the medical evidence and the opinions on both sides of the issues.'" Evans v. UnumProvident Corp., 434 F.3d 866, 876 (6th Cir. 2006) (citing McDonald, 347 F.3d at 172.).

To determine whether a plan administrator's decision to deny benefits was arbitrary and capricious, courts consider not just the medical evidence and opinions, but also whether there is a conflict of interest, whether the plan administrator failed to give consideration to the Social Security Administration's determination that the applicant was totally disabled, and whether the plan administrator based its decision to deny benefits on a file review instead of conducting a physical examination of the applicant. DeLisle v. Sun Life Assurance Co. of Canada, 558 F.3d 440 (6th Cir. 2009); Bennett v. Kemper Nat. Services, Inc., 514 F.3d 547 (6th Cir. 2008); Calvert v. Firstar Finance, Inc., 409 F.3d 286 (6th Cir. 2005). Such findings do not change the standard of review, but they do factor into the Court's analysis when determining whether the administrator's decision was arbitrary or capricious. Bennett, 514 F.3d at 552.

## DISCUSSION

Thornton argues that Western & Southern arbitrarily and capriciously denied his claim for long-term disability benefits because (1) the administrative record substantiates that Thornton is long-term disabled as defined by Western & Southern's Flexible Benefits Plan, (2) no adequate medical evidence supports Western & Southern's finding that Thornton is able to work, (3) Western & Southern waived the pre-existing condition exclusion and is estopped from claiming that a pre-existing condition prevented Thornton from obtaining long-term disability benefits; and (4) Thornton met the length of employment requirement of the Plan. Thornton also argues that Western & Southern's conflict of interest as both administrator of the Plan and payor of claims, its failure to consider the Social Security Administration's contrary decision, its selection of a clearly biased physician to perform the IME, its failure to consider the treating physicians opinions, and its failure to provide all of Thornton's medical records to Dr. Primm support a finding that Western & Southern acted arbitrarily in denying his claim.

Western & Southern counters that it has offered a reasoned explanation of its decision. Specifically, Western & Southern maintains that it appropriately determined that Thornton did not work long enough to be eligible for long-term disability benefits, that Thornton's claimed disability resulted from a pre-existing condition, and that Plaintiff did not satisfy the long-term disability definition in the Plan. Western & Southern also argues that it was not required to afford Plaintiff's treating physicians special deference or consider the Social Security Administration's decision which was decided after the appeal was complete.

### A. Conflict of Interest

For purposes of ERISA claims, there is a conflict of interest where the insurance company

is both the "decision maker, determining which claims are covered, and also the payor of those claims." Calvert, 409 F.3d at 292. In this case, Western & Southern is both the decision-maker and payor under the insurance policy. Considering Thornton's age, payment of this claim would be expensive for Western & Southern. Thus, there is a significant financial incentive for Western & Southern to deny the claim. Accordingly, the Court will "view [Western & Southern's] explanation [for denying Thornton's claim for benefits] with some skepticism" and will weigh this conflict as a factor in deciding whether Western & Southern's decision was arbitrary and capricious. Moon, 405 F.3d at 381-82.

### B. Length of Employment Requirement

Western & Southern maintains Thornton was not eligible for long-term disability benefits under the terms of the Plan. Western & Southern represents that the Plan provides that an employee is eligible for long-term disability coverage "the first of the year following your second employment anniversary provided you are an active full-time associate regularly scheduled to work at least 30 hours a week and you are actively working on such date." (Defendants' Reply at 14 (quoting 2009 Benefits Summary Plan at 87, WS 420).) According to Western & Southern, Thornton began working for the company on July 11, 2005. Thornton underwent surgery in June of 2007. He returned to work, but once again left on August 27, 2007. Thornton did not return to active employment after that time. Western & Southern argues that since Thornton was not actively at work on January 1, 2008, he was not eligible for long-term disability benefits.

Contrary to Western & Southern's argument, a review of the Plan reflects that Thornton did meet the length of employment requirement. The Plan provides that "[a] Field Representative . . . shall not be eligible for Long Term Disability Benefits until the January 1 of the Plan Year following

the completion of his second Year of Employment." (Plan § 7.2(b).) "Year of Employment" is defined as the "12 consecutive month period beginning on an Employee's most recent date of Employment and on each subsequent anniversary of such date during which an Employee completes at least 1,000 hours of work for which the Employee is paid or entitled to be paid." (Id. at § 2.59.) Western & Southern has put forth no argument that Thornton had not satisfied the "Year of Employment" definition under the Plan. It appears that Thornton worked at least 1,000 hours between July 11, 2006 to July 11, 2007. Furthermore, the language relied upon by Defendants in their pleadings is not from the Plan itself but from the 2009 Benefits Summary Plan. The 2009 Benefits Summary Plan appears to conflict with the Plan itself and is not applicable given that Thornton's claim for long-term disability benefits was denied in February of 2008. Accordingly, Thornton met the length of employment requirement.

### C. Pre-Existing Condition

Western & Southern maintains that Thornton was not eligible for long-term disability benefits because his claimed disability resulted from a pre-existing neck injury. The Plan contains a pre-existing condition limitation that provides in part as follows: "No benefits shall be paid for any period of Long Term Disability . . . which results from a Pre-existing Condition." (Id. at § 7.6.) The Plan defines pre-existing condition as "any condition, Sickness or Injury (whether physical or mental) regardless of cause, for which medical advice, diagnosis, care or treatment was recommended or received within a six month period prior to the most recent date on which the individual became eligible for coverage under the Plan as a Covered Person . . . ." (WS 191-192; Plan, § 2.42.) As discussed above, Section 7.2 of the Plan states that a Field Representative shall not be eligible for Long Term Disability Benefits until January 1 of the Plan Year following the

completion of his second year of employment. (Id. at §7.2(b).) Thus, the date Thornton became eligible for coverage under the Plan was January 1, 2008.

The record clearly reflects that Thornton received medical advice, diagnosis, care, and treatment for his neck injury within the six month period prior to his eligibility date. Specifically, in August 24, 2007, Dr. Dimar informed Thornton that he would need to undergo additional surgery to place an anterior plate in his neck and that he should not return to work until the end of the year. Thornton underwent surgery on October 8, 2007. At his follow-up appointment on October 23, 2007, Dr. Dimar told Plaintiff that he could not return to work because of his neck injury. Thornton was treated for his neck injury six months prior to his eligibility date of January 1, 2008. As a result, Thornton was not eligible for long-term disability benefits because his claimed disability resulted from a pre-existing neck injury.

### D. Waiver & Estoppel

Thornton claims that the doctrines of waiver and equitable estoppel bar Western & Southern from denying his long-term disability benefits based on the pre-existing condition requirement because (1) Western & Southern awarded Thornton short-term disability benefits and (2) Western & Southern representatives repeatedly reassured Thornton that he would receive long-term disability benefits.

### 1. Equitable Estoppel

Thornton argues that the principles of equitable estoppel prevent Western & Southern from denying Plaintiff's long-term disability benefits based on the pre-existing condition exclusion contained in the Plan. Thornton argues that General District Manager Mike Luczaj, Sales Manager Fred Cooper, and Western & Southern Benefits Department Case Manager Traci Simms represented

that Plaintiff would receive long-term disability benefits.  Thornton maintains that Simms was aware, or should have been aware, as a member of Western & Southern's Benefits Department, that Western & Southern may actually deny Plaintiff's long-term disability benefits on the basis of the pre-existing condition.  According to Thornton, Western & Southern intended for him to rely on these representations, and he did so to his detriment, ultimately resulting in his declaration of bankruptcy.

The Sixth Circuit has recognized that "equitable estoppel may be a viable theory in ERISA cases." Sprague v. General Motors Corp., 133 F.3d 388, 403 (6th Cir. 1998); Agee v. Jennie Stuart Medical Center, 2007 WL 923090, *5 (W.D. Ky. March 23, 2007).  The elements of an equitable estoppel claim are as follows: "(1) there must be conduct or language amounting to a representation of material fact; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must intend that the representation be acted on, or the party asserting the estoppel must reasonably believe that the party to be estopped so intends; (4) the party asserting the estoppel must be unaware of the true facts; and (5) the party asserting the estoppel must reasonably or justifiably rely on the representation to his detriment." Sprague, 133 F.3d at 403 (citing Armistead v. Vernitron Corp., 944 F.2d 1287, 1298 (6th Cir. 1991)).  However, "[p]rinciples of estoppel . . . cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provisions." Sprague, 133 F.3d at 404.  In the present case, the Plan clearly and unambiguously provides that a Field Representative is not eligible for coverage until January 1 following his second anniversary of employment and that pre-existing conditions disqualify participants from long-term disability benefits.  Reliance on statements suggesting the contrary was not reasonable or justifiable.  Id.  As there is no ambiguity in the Plan documents,

Thornton cannot invoke principles of estoppel.

## 2. Waiver

It is not clear that waiver is a viable claim under the federal common law of ERISA. The Sixth Circuit has not ruled on the issue and there is a split in the circuits. See Agee v. Jennie Stuart Medical Center, 2007 WL 923090, *5 (W.D. Ky. 2007)(citing Thomason v. Aetna Life Ins. Co., 9 F.3d 645, 647-49 (7th Cir. 1993)(waiver may be viable claim); Pitts v. Am. Sec. Life Ins. Co., 931 F.2d 351, 357 (5th Cir. 1991)(same); Glass v. United of Omaha Life Ins. Co., 33 F.3d 1341, 1348 (11th Cir.1994)(same); but see White v. Provident Life & Accident Ins. Co., 114 F.3d 26, 29 (4th Cir. 1997)(stating that federal common law under ERISA does not incorporate the principles of waiver and estoppel)); International Coal Group, Inc. v. Pennington, 2009 WL 321038, *8 (E.D. Ky. 2009). Despite this uncertainty, the Court will address Thornton's waiver arguments out of an abundance of caution.

A waiver is "a voluntary and intentional relinquishment of a known right." J. Calamari and J. Perillo, The Law of Contracts § 11-29(c) at 491 (3d ed.1987); LeBoon v. Lancaster Jewish Cmty. Cntr. Ass'n., 503 F.3d 217, 225 (3d Cir. 2007) (citing United States v. Olano, 507 U.S. 725, 733 (1993)); see also Thomason, 9 F.3d at 647-48; Agee, 2007 WL 923090, *5. "'Both the Seventh Circuit and the Eleventh Circuit Court of Appeals concluded that if the common law of ERISA encompasses waiver claims, it is not 'something-for-nothing kind of waiver whereby [a defendant] will be held to the terms of its misleading representations for no other reason than that it made them.'" Agee, 2007 WL 923090, *5 (quoting Thomason, 9 F.3d at 649); see also Glass, 33 F.3d at 1348. Thus, "in order to establish a claim of waiver, the plaintiff must demonstrate that the defendant intentionally relinquished its known rights, resulting in a detriment to the plaintiff or a

benefit to the defendant." <u>Agee</u>, 2007 WL 923090, *5.

First, Thornton argues that because Western & Southern failed to apply the preexisting condition clause to short-term disability claim, the company has waived the right to rely on the clause to deny long-term disability claim. Thornton argues that the pre-existing condition clause applicable to short-term disability is the same as the pre-existing condition clause applicable to long-term disability. (<u>See</u> Plan § 10.4 ("No benefits shall be paid for any period of Temporary Disability . . . which results from a Pre-existing Condition.") Thornton received short-term disability. As a result, Thornton maintains that by not applying the pre-existing condition clause to short-term disability, Western & Southern voluntarily relinquished a known right.

A review of the record reflects that the pre-existing condition provision found in the short-term disability section of the Plan would not exclude short-term disability payments to Thornton. (<u>See</u> Plan, § 10.1, § 10.4.)[1] Section 10.1 of the Plan specifically states that "[a] Field Representative and District Office Clerical Employee shall be eligible for Temporary Disability Benefits effective upon the **first day of the month** following the Field Representative's or District Office Clerical Employee's **first Employment anniversary date**." (emphasis added). Thus, unlike the long-term disability eligibility provision, Thornton was eligible for short-term disability on August 1, 2006. The Administrative Record does not reflect any treatment for neck pain six months prior to August 1, 2006. Therefore, it would appear that Western & Southern's award of short-term disability to Thornton in August of 2007 was appropriate due to the different eligibility dates associated with the

_____

[1]As discussed above, the Plan defines pre-existing condition as "any condition, Sickness or injury (whether physical or mental) regardless of cause, for which medical advice, diagnosis, care or treatment was recommended or received within a six month period prior to the most recent date on which the individual became eligible for coverage under the Plan as a Covered Person . . . ." (WS 191-192; Plan, § 2.42.)

short-term and long-term disability provisions. (WS 629; Simms Letter to Harpring.)

Additionally, Thornton has not shown that Western & Southern intentionally relinquished its known right to assert a pre-existing condition exclusion to Thornton's long-term disability claim. Western & Southern's initial decision not to assert the pre-existing condition exclusion as to Thornton's short-term disability claim does not prevent its assertion of the exclusion in connection with its review of Thornton's long-term disability benefits claim. The eligibility requirements for the two types of disability benefits are contained in separate sections of the Plan and contain different requirements. Thornton offers no authority that a Plan participant who receives short-term disability will automatically qualify for long-term disability benefits. Thus, Western & Southern did not waive the pre-existing clause in the long-term disability plan because it awarded Thornton short-term disability benefits.

Second, Thornton argues that through its agents District Manager Mike Luczaj, Sales Manager Fred Cooper, and Benefits Department Case Manager Traci Simms, Western & Southern repeatedly reassured Plaintiff that he would receive long-term disability benefits. As such, Thornton argues that Western & Southern has waived its right to rely on the preexisting condition clause. The Court disagrees. The record reflects that Luczaj, Cooper, and Simms had no authority to make benefits determinations. Vonderheide testified that he was the only one with authority under the Plan to make decisions to approve or deny a claim for benefits. (Vonderheide Dep. at 17.) In addition, Section 14.11 of the Plan reflects that except in limited circumstances, "no term, condition, or provision of [the] Plan shall be deemed to be waived . . . except through a writing of the party to be charged by the waiver. . . ." (Plan §14.11; WS 269.)

Furthermore, as discussed above, if the federal common law of ERISA encompasses waiver

claims, it is not a "something-for-nothing kind of waiver whereby [a defendant] will be held to the terms of its misleading representations for no other reason than that it made them.'" Agee, 2007 WL 923090, *5 (quoting Thomason, 9 F.3d at 649). In the present case, just as in Thomason and Agee, Thornton offers only these employees' bare misrepresentations to establish waiver. Thornton offered no evidence "that the waiving party has received consideration for the waiver or that the non-waiving party has acted in reasonable reliance on the apparent waiver." Thomason, 9 F.3d at 648. Thus, the Court finds these statements do not reflect a voluntary and intentional waiver of the pre-existing condition exclusion.

For these reasons, the Court concludes that Western & Southern did not act arbitrarily or capriciously in denying Thornton's long-term disability claim and summary judgment in favor of Western & Southern on the ERISA claim is granted.

## III.  MOTION FOR SUMMARY JUDGMENT ON THE NON-ERISA CLAIMS

In addition to the ERISA claim, the Plaintiff in his Complaint asserts causes of action for (1) for a violation of the Kentucky Wage and Hour Act, KRS § 337.010, *et seq.*, (2) breach of fiduciary duty, and (3) appropriation of Plaintiff's name and likeness.

### A. Standard of Review

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a

genuine issue of fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party is required to do more than simply show there is some "metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The rule requires the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  Anderson, 477 U.S. at 252.

**B.  Thornton's Employment Contract**

At the time he was hired, Thornton signed an Employment Agreement which outlined the terms and conditions of his employment.  The Employment Agreement provides in relevant part that Thornton agreed "not to commence any action or suit relating to your employment with Western & Southern more than six months after the date of termination of such employment, and to waive any statute of limitation to the contrary."  (Sales Representative Agreement, § III C.)  Thornton was released from employment on January 28, 2008, and filed suit on December 2, 2008, more than six months after his separation from employment.  As a result, Western & Southern maintains that Thornton's non-ERISA claims are barred by the limitations period set forth in the employment contract.

It is well settled in Kentucky that "parties, dealing at arm's length, may contract for a limitation shorter than that provided by statute, so long as the period provided for is a reasonable

one." Prewitt v. Supreme Council of Royal Arcanum, 194 S.W.2d 633, 635 (Ky. 1946). See also Munday v. Mayfair Diagnostic Laboratory, 831 S.W.2d 912, 914 (Ky. 1992)("Parties are at liberty to contract for a limitation period less than the period fixed by statute.). Additionally, other federal district courts and state courts located in this circuit have upheld a predetermined limitations period for bringing legal action against an employer as agreed upon in an employment application or employment contract. Dunn v. Gordon Food Services, Inc., ___ F. Supp.2d ___, 2011 WL 590333, *4 (W.D. Ky. Feb. 10, 2011)(citing Boaz v. Fed. Exp. Corp., 742 F. Supp. 2d 925, 932–33 (W.D. Tenn. 2010); Ellison v. DaimlerChrysler Corp., 2007 WL 3171758, *5 (N.D. Ohio Oct. 30, 2007); Skaan v. Fed. Exp. Corp., 2010 WL 5140627, *1–2 (Tenn. Ct. App. Dec. 14, 2010); Dedivanaj v. DaimlerChrysler Corp., 2007 WL 1791709, *1 (Mich. Ct. App. June 21, 2007)).

Thornton concedes that he voluntarily entered into the employment contract that obligated him to bring any claims relating to his employment within six months of his termination. However, Thornton argues that his non-ERISA claims are not time-barred because the claims do not relate to his employment with Western-Southern and the six month limitations period is unreasonable.

First, the Court finds that Thornton's claims for violation of the Kentucky Wage and Hour Act and breach of fiduciary duty relate to his employment. Thornton claims that Western & Southern violated the Kentucky Wage and Hour Act because it did not pay him the LTIR units within fourteen days from his separation of employment. KRS § 337.055. Similarly, Thornton alleges breach of fiduciary duty based upon the same conduct. Accordingly, both claims relate to Western & Southern's decision to deny him his "wages" or compensation. However, the Court finds that Thornton's misappropriation claim does not relate to his employment. Instead, it relates to the conduct of Western & Southern two months after Plaintiff's employment had terminated.

Second, the Court finds that the six-month limitations period in the employment agreement is reasonable. Although Kentucky courts have not analyzed the reasonableness of this particular clause, several federal courts have upheld the clause as being reasonable. See Myers v. Western-Southern Life Ins. Co., 849 F.2d 259, 261 (6th Cir. 1988)(upholding six month clause even where administrative remedies have not been completed); Jasper v. Western & Southern Life Ins. Co., Inc., Civil Action No. 03-7-DLB (E.D. Ky. Sept. 19, 2003). See also Thurman v. DaimlerChrysler, Inc., 397 F.3d 352 (6th Cir. 2004)(plaintiff filled out and signed an employment application that contained a clause restricting lawsuits against his employer to six months after the date of the tortious act or omission; citing Michigan law, the Sixth Circuit Court of Appeals upheld the provision as reasonable. Id. at 355–59).

Thornton argues that in the present case the six-month limitations period is unreasonable because Thornton was pursuing an appeal with Western & Southern regarding the LTIR benefits. On May 21, 2008, Western & Southern notified Plaintiff that it would not pay the LTIR benefits and informed Plaintiff that he had 180 days to appeal the denial to the benefits appeal committee. Plaintiff contends that he pursued the internal administrative remedies that Western & Southern instructed him to pursue and had no way of knowing that he would have to file a lawsuit to obtain his benefits until the Western & Southern Appeals Committee denied his appeal in September of 2008. The Court disagrees.

In the present case, the employment agreement clearly provided that Thornton agreed "not to commence any action or suit relating to your employment with Western & Southern more than six months after the date of termination of such employment, and to waive any statute of limitation to the contrary." (Sales Representative Agreement, § III C.) Additionally, under the Wage and

Hour statute in question, the benefits sought were due Plaintiff fourteen days after termination of his employment. Significantly, nothing in the LTIR Plan precluded Thornton from filing a lawsuit prior to the conclusion of the appeals process. In fact, in order to preserve his claim, Thornton could have filed suit then sought a stay of the proceedings until the appeals process was resolved. See Badgett v. Fed. Express Corp., 378 F. Supp. 2d 613, 626 (M.D. N.C. 2005)(upholding a shorter contractual limitation period for emotional distress, § 1981, and FMLA claims and finding that plaintiff could have filed those claims, along with the Title VII claim which had a longer statute of limitations, at the same time and requested to stay pending the outcome of the EEOC charge). Accordingly, the limitation provision contained in the employment contract signed by Plaintiff does not violate Kentucky law and is reasonable under the circumstances.

For these reasons, the Court finds that Thornton's claims for violation of the Kentucky Wage and Hour Act and breach of fiduciary duty are barred as untimely. Notwithstanding this decision, the Court will address the merits of those two claims.

### C. Wage and Hour Act Claim (Count I)

Plaintiff claims that Western & Southern violated the Kentucky Wage and Hour Act, specifically KRS § 337.055, because it did not pay him the LTIR units within fourteen days from his separation from employment.[2] Western & Southern, however, asserts that the Kentucky wage

---

[2] KRS 337.055 provides:
Any employee who leaves or is discharged from his employment shall be paid in full all wages or salary earned by him; not later than the next normal pay period following the date of dismissal or voluntary leaving or fourteen (14) days following such date of dismissal or voluntary leaving whichever last occurs. Any employee who is absent at the time fixed for payment by an employer, or who, for any other reason, is not paid at that time, shall be paid thereafter at any time or upon fourteen (14) days' demand. No employer shall, by any means, secure exemption from this section.

and hour laws are inapplicable because Thornton was an outside sales person and, as such, is not entitled to recover damages under Count I pursuant to KRS § 337.010 and KRS § 337.055.

Under Kentucky wage and hour law, employees may recover wages, to which they may be entitled, as well as costs and reasonable attorney's fees. KRS § 337.385. This ability to recover, however, is limited by KRS § 337.010(2)(a)(2) which excludes from the definition of employee "any individual employed . . . in the capacity of outside salesman." Section 6 of the Kentucky Administrative Regulations defines an "outside sales employee" as any employee "whose primary duty is making sales." 803 KAR 1:070 § 6(1)(a).[3] See Roby v. Midstates Indus. Group, Inc., 2007 WL 2025177, *1 (W.D. Ky. July 6, 2007). Whether Thornton is an exempt employee under KRS Chapter 337 is a legal issue for the Court to decide. Puckett v. Automed Technologies, Inc., 2009 WL 1530677, *3 (W.D. Ky. June 1, 2009).

Western & Southern's Summary Job Description of Sales Representatives provided that Thornton's duties as a sales representative made him responsible for "sales and retention of insurance policies" and noted that on average 80% of his time would be "spent in the field driving to and/or visiting policy holders in their home or businesses." The job description further stated that on average 20 percent of his time would be "spent on administrative requirements involving verbal

---

[3] Specifically, the Kentucky Administrative Regulations provide that the term "individual employed in the capacity of outside salesman" shall mean any employee:
(a) Whose primary duty is:
1. Making sales; or
2. Obtaining orders or contracts for services or for the use of facilities for which consideration will be paid by the client or customer; and
(b) Who is customarily and regularly engaged away from the employer's place or places of business in performing the employee's primary duty.

803 KAR 1:070 §6.

and written communication." (WS 511; Western Southern Financial Group, Summary Job Description, DN 41-3.) In addition, Thornton testified in his deposition that the majority of sales were done at his customer's homes, including preparing the policies. When asked about how he sold policies, Thornton testified that he "did it the old-fashioned way" by knocking on doors. (Thornton Dep. at 42-49.) Both the formal job description and Thornton's deposition testimony support a finding that Thornton was an outside sales employee. As an outside salesperson, Thornton does not meet the statutory definition of an employee, and therefore, may not recover under the Kentucky wage and hour law. Roby, 2007 WL 2025177, * 2. See also Bouder v. Prudential Financial, Inc., 2010 WL 3515567, *5 (D.N.J. 2010).

The Court rejects Thornton's attempt to create a material issue of fact by filing an affidavit which appears to contradict Thornton's earlier deposition testimony. Lanier v. Bryant, 332 F.3d 999, 1004 (6th Cir. 2003). Plaintiff's statement in his affidavit that he had "many" of his clients meet with him at the Western & Southern office in order to take applications is contradicted by his previous deposition testimony in which he testified that he "mainly" sold policies at his customer's homes. (Thornton Dep. at 48-49.) The Court is mindful that Thornton made appointments with clients from his office and participated in meetings with Western & Southern managers at the office. However, the regulation requires only that an employee be regularly away from the office when conducting his primary duties. The undisputed facts show that Thornton customarily and regularly engaged in his sales activities away from the office in his customer's homes. (Id.) See Schmidt v. Eagle Waste & Recycling, Inc., 598 F. Supp. 2d 928 (W.D. Wis. 2009).

For these reasons, the Court grants summary judgment in favor of the Defendants as to this claim.

### D.  Breach of Fiduciary Duty (Count II)

Kentucky law describes fiduciary duty as "one founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking."  Hinton Hardwoods, Inc. v. Cumberland Scrap Processors Transport, 2008 WL 5429569, *6 (Ky. Ct. App. Dec. 31, 2008)(quoting Steelvest, Inc. v. Scansteel Service Center, Inc., 807 S.W.2d 476, 485 (Ky. 1991)). In order to prevail on a claim for breach of fiduciary duty, a plaintiff must establish that (1) the defendant owes a fiduciary duty to it; (2) the defendant breached that duty; and (3) the defendant suffered damages as a result of the breach.  Id. (citing Sparks v. Re/Max Allstar Realty, Inc., 55 S.W.3d 343, 348 n. 15 (Ky. Ct. App. 2000)).

Thornton asserts that as the Plan Administrator of the LTIR Plan, Western & Southern "owes a fiduciary duty of care and loyalty to plan participants and beneficiaries that includes the duty to make decisions in the sole interests of plan participants and, in doing so, to use the same care, skill, prudence and diligence that a prudent person acting in a like capacity would use." (Complaint ¶ 40.) Thornton argues that Western & Southern breached the fiduciary duty of care and loyalty by denying Thornton's request for LTIR Plan benefits and by finding that the benefits were not vested. Thornton asserts that the medical evidence overwhelmingly supports a finding that he is long-term disabled.

Western & Southern argue that Thornton's claim for breach of fiduciary duty should be dismissed.  According to Defendants, since claims for denial of benefits cannot be recast as a claim for breach of fiduciary duty under ERISA principles, those same principles should be employed in this case.  Additionally, Western & Southern argues that it made a reasonable determination that

Plaintiff was not eligible for LTIR vesting because he did not qualify for disability benefits under the long-term disability plan, and as a result, the breach of fiduciary duty claim fails.

Under Kentucky law, "[a] breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie. A breach of a duty *arising independently* of any contract duties between the parties, however, may support a tort action." Presnell Construction Mgrs., Inc. v. EH Const., LLC, 134 S.W.3d 575, 589 (Ky. 2004)(Keller, J., concurring)(emphasis in original). See also Quadrille Business Systems v. Kentucky Cattlemen's Association, Inc., 242 S.W.3d 359, 365 (Ky. Ct. App. 2007)(a plaintiff cannot sustain an action for breach of a fiduciary duty where the plaintiff alleges that the fiduciary duty arose solely from the alleged agreement); Battista v. Lebanon Trotting Ass'n., 538 F.2d 111, 117 (6th Cir. 1976)(Under Ohio law, a tort exists only if a party breaches a duty which he owes to another independent of the contract, that is, a duty which would exist even if no contract existed.).

After a review of the parties' argument and the Complaint, the Court finds that Plaintiff has failed to put forth sufficient evidence that Western & Southern owed a fiduciary duty to him in administering the LTIR Plan. As stated above, a "breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract." Presnell, 134 S.W.3d at 589. Beyond the LTIR Plan, Thornton has not identified the source of the duty of loyalty and care articulated in the Complaint. ERISA imposes similar duties and obligations on plan fiduciaries including a duty of loyalty to plan participants and beneficiaries and a duty of care that requires it to act "with the care, skill, prudence, and diligence under the circumstances." 29 U.S.C. § 1104(a)(1)(B). In fact, the duty Thornton alleges that the Defendants breached appears to be the same duty imposed upon fiduciaries under ERISA. However, both parties agree that the LTIR

Agreement is not governed by ERISA. The action of Defendants set out in the Complaint relate primarily to alleged failures to carry out the company's LTIR contractual obligations to Thornton. These actions are essentially allegations stemming from the breach of the LTIR Agreement. Thus, under the current status of the record, Thornton has not identified a duty that Defendants owe to him independently of the contract in question. For these reasons, summary judgment is granted on Plaintiff's breach of fiduciary duty.

### E.  Appropriation of Name or Likeness (Count IV)

In March of 2008, more than two months after terminating Thornton, Western & Southern sent a newsletter to its customers with an unauthorized cover letter, purportedly written by Thornton and containing Thornton's name and likeness. The letter indicated that Thornton was available to assist the customers with any financial security product.[4] Thornton argues that Western & Southern acted without authority and that he was damaged by the unlawful appropriation of his name and likeness. According to Plaintiff, he received several phone calls after the newsletter was mailed and Plaintiff directed these people to call Western & Southern after having to inform them that he was no longer with Western & Southern. As of April 12, 2008, almost three months after Thornton's termination, Thornton's voicemail at Western & Southern was still activated and his name was still recorded in the company directory. Thornton alleges that this evidence supports his claim for appropriation of Plaintiff's name and likeness.

The Kentucky Supreme Court adopted the principles of the invasion of privacy tort from the

---

[4]The cover letter provided in part: "I'm always available to assist you as your financial needs evolve. My primary duty is to provide you with the best service and financial security products available. Working together, we can assess your situation and determine how you can achieve your short-term and long-term goals. Feel free to contact me at the telephone number above or by completing the attached reply card." (March 2008 Letter; DN 36-15.)

Restatement (Second) of Torts.  McCall v. Courier-Journal and Louisville Times Co., 623 S.W.2d 882, 887 (Ky. 1981).  The Restatement provides:

> (1) One who invades the right of privacy of another is subject to liability for the resulting harm to the interests of the other.
> (2) The right of privacy is invaded by
>> (a) unreasonable intrusion upon the seclusion of another . . .; or
>> (b) appropriation of the other's name or likeness . . .; or
>> (c) unreasonable publicity given to the other's private life . . .; or
>> (d) publicity that unreasonably places the other in a false light before the public. . .

Restatement (Second) of Torts § 652A (1976). See also Bowling v. Missionary Servants of Most Holy Trinity, 972 F.2d 346, 1992 WL 181427, *4 (6th Cir. July 30, 1992); McCall, 623 S.W.2d at 887 (Ky. 1981).  This case involves section 652A(2)(b), a claimed invasion of privacy by appropriation of another's name or likeness.  Section 652C of the Restatement (Second) provides that "[o]ne who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy."  In order to impose liability under this section, "'the defendant must have appropriated to his own use or benefit the reputation, prestige, social or commercial standing, public interest or other values of the plaintiff's name or likeness.'" Foster v. Livingwell Midwest, Inc., 865 F.2d 257, 1988 WL 134497, *2 (6th Cir. Dec. 16, 1988)(citing Restatement (Second) of Torts § 652C, cmt c); see also Bowling, 1992 WL 181427, *5.  In addition, "no liability attaches if the use or appropriation is 'incidental.'"  Id.

> Appropriation of name or likeness actions are intended to protect "the interest of the individual in the exclusive use of his own identity, in so far as it is represented by his name or likeness, and in so far as the use may be of benefit to him or to others." Restatement (Second) of Torts § 652C cmt. a. This interest is "in the nature of a property right." Id. Although this cause of action is most commonly used to provide redress for plaintiffs whose names are used without permission to advertise a business or product, "it also applies when the defendant makes use of the plaintiff's name or likeness for his own purposes and benefit, even though the use is not a commercial one, and even though the benefit sought to be obtained is not a pecuniary

one." Id. at cmt. b; accord Zachini v. Scripps Howard Broadcasting Co., 47 Ohio St.2d 224, 229, 351 N.E.2d 454, 458 (1976).

Bowling, 1992 WL 181427, *5.

Western & Southern argues that Thornton's appropriation of his name and likeness claim fails as a matter of law. Western & Southern contends that the newsletter was prepared and sent to the printer by the marketing department at Western & Southern in January of 2008, when Thornton was still employed. By the time the newsletters were printed and mailed out, in March of 2008, Thornton was no longer employed. According to Western & Southern, there was simply an innocent time lapse between when the information was sent to the printer and when the newsletter was ultimately mailed. Western & Southern argues that summary judgment should be granted on Plaintiff's claim because (1) Thornton is not a celebrity and there is no proof that his likeness has significant commercial value; (2) Thornton testified that the publication of the newsletter resulted in no harm to him physically, mentally or financially (Thornton Dep. at 56-58); and (3) the evidence reflects that Western & Southern did not profit from the newsletter.

First, a reasonable jury could find that Thornton's name and likeness had a commercial value within Western & Southern's customers or potential customers. Thornton was a very successful salesman and top performer for Western & Southern. Thornton's name and picture were used in correspondence that was sent to his former clients and contacts at Western & Southern. In this context, the jury could find that Thornton's "name clearly had a commercial value, as personal letters are used to induce future sales to customers who have established a client relationship with the [company]." James v. Bob Ross Buick, Inc., 855 N.E.2d 119, 123 (Ohio Ct. App. 2006). See also Landham v. Lewis Galoob Toys, Inc., 227 F.3d 619, 624 (6th Cir. 2000)(the use of "plaintiff's identity, however, may be sufficient evidence of commercial value"). Furthermore, a reasonable

26

jury could believe that Western & Southern was also attempting to maintain the current customer base built by Thornton or was cashing-in on the goodwill associated with Thornton's name. This decision is further supported by the fact that his voicemail was still active and he was still listed on the company directory three months after he was terminated. Furthermore, contrary to Western & Southern's argument, Thornton does not have to be a "celebrity" to state an appropriation of name or likeness claim. Cheatham v. Paisano Publications, Inc., 891 F. Supp. 381, 386 (W.D. Ky. 1995).

Second, nominal damages are available for appropriation of a person's name or likeness. James v. Bob Ross Buick, Inc., 855 N.E.2d at 124. "'A claimant alleging misappropriation of identity need not prove actual damages, because the court will presume damages if someone infringes another's right to control his identity.'" Id. (quoting Petty v. Chrysler Corp., 799 N.E.2d 432 (2003)). See also Restatement (Second) of Torts, § 652H (1977) (permitting a plaintiff who has established an unlawful invasion of privacy to recover damages for "harm to his interest in privacy," "mental distress" resulting from the invasion, and "special damage of which the invasion is a legal cause"); Bowling v. Missionary Servants of Most Holy Trinity, 1992 WL 181427, *6 (6th Cir. July 30, 1992)(recognizing that nominal damages are appropriate under the false-light theory of invasion of privacy in Restatement (Second) of Torts, §652A(2)(d) and §625H); O'Phelan v. Loy, 2011 WL 2006426, *7 (D. Haw. May 23, 2011)(nominal damages are to be awarded where an invasion of privacy is proven but no compensatory damages are established); Gignilliat v. Gignilliat, Savitz & Bettis, L.L.P., 684 S.E.2d 756, 762 (S.C. 2009)(same). Despite the fact that Thornton testified in his deposition that he suffered no physical, mental, or financial harm from the newsletter, courts have consistently recognized that nominal damages are available for the appropriation of a person's name or likeness. See James, 855 N.E.2d at 124. Accordingly, a plaintiff asserting a claim for

appropriation of a person's name or likeness may seek nominal, compensatory, and, if appropriate, punitive damages.

Third, the Court rejects Western & Southern's argument that in order to establish liability for the appropriation of a person's name or likeness under Section 625C, a plaintiff must establish that the defendant profited from the misappropriation.[5] To plead misappropriation of identity under Restatement(Second) of Torts, § 625C, the plaintiff must prove an appropriation without consent, of one's name or likeness for another's use or benefit. Comment b of the Restatement (Second) of Torts, § 625C recognizes that the benefit sought to be obtained need not be a pecuniary one. Furthermore, as discussed above, while any monetary benefit that Western & Southern received as a result of its alleged wrongful use of Thornton's name is an appropriate measure of Thornton's actual damages, it is not the only measure of damages. See, e.g., James, 855 N.E.2d at 124.

For these reasons, the Court concludes that summary judgment is not appropriate on this claim.

## IV. MOTION TO STRIKE

Defendants move to strike the Plaintiff's "Reply Memorandum" addressing his ERISA claim arguing that it was filed in violation of the Court's Scheduling Order and is Plaintiff's attempt to get the last word on matters. After a review of the arguments, the Court denies the motion to strike. Given the complexity of the case, the Court would have granted leave for Plaintiff to file the reply if leave had been requested. Furthermore, the Court has considered the arguments contained in the

---

[5]The Kentucky Supreme Court in Montgomery v. Montgomery, 60 S.W.3d 524, 527-528 (Ky. 2001) analyzed whether an individual's voice or image was appropriated for "commercial profit" under the statutory right of publicity, KRS § 391.170, as opposed to common law tort of appropriation of name or likeness.

Defendants' Motion to Strike in determining the summary judgment motions. Essentially, the Court has treated the Defendants' Motion to Strike as a surreply.

## V.  CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment [DN 36] is **granted in part and denied in part**.  Summary judgment is granted as to Counts I, II, and III.  Summary judgment is denied as to Count IV, Appropriation of Plaintiff's Name and Likeness.  The motion by Plaintiff, Scott Thornton, for summary judgment regarding LTIR Plan Benefits [DN 37] is **denied.**  This matter is referred to the Magistrate Judge for a settlement conference on the remaining claim.

**IT IS FURTHER ORDERED** that the motion by Defendants to strike the Plaintiff's "Reply Memorandum" addressing his ERISA claim [DN 49] is **denied**.

cc: counsel of record
   Mag. Judge James Moyer